**L.A. GEAR, INC., Plaintiff,**

v.

**E.S. ORIGINALS, INC.,
et al., Defendants.**

**No. CV 93–5342 WJR (SHx).**

United States District Court,
C.D. California.

Aug. 2, 1994.

**1296**

William J. Robinson, Graham & James, Los Angeles, CA, for plaintiff.

David W. Grace, Spensley, Horn, Jubas & Lubitz, Los Angeles, CA, for defendants.

## MEMORANDUM AND ORDER

REA, District Judge.

On June 20, 1994, the Court conducted a hearing regarding the Motion for Summary Judgment filed by defendant Voit Sports, Inc. ("Voit"). Having duly considered the papers filed in support of and in opposition to the motion, the evidence submitted by all parties, the applicable authorities and the arguments of counsel, the Court finds that, as a matter of law, defendant Voit neither directly nor indirectly infringed the patent-in-suit owned by plaintiff L.A. Gear, Inc. ("LAG"). Accordingly, the Court hereby grants Voit's motion in its entirety.

## I. BACKGROUND

On September 2, 1993, LAG filed a complaint alleging a single claim for patent infringement against various defendants. LAG claims that defendant E.S. Originals ("ESO") manufactured and distributed athletic shoes which improperly incorporated a flashing-light device covered by one of LAG's patents. Defendants Dayton Hudson Corp., Wal–Mart Stores, Inc., and Montgomery Ward & Co., Inc. are retailers and purchasers of ESO's allegedly infringing products. Defendants Voit and Sasson Licensing Corp. ("Sasson") are entities who licensed ESO to use their trademarks on the accused shoes.

The patent-in-suit, United States Patent No. 4,158,922 (the " '922 patent"), claims "[a] lighted shoe having a solid state oscillator circuit for causing periodic flashing on and off of" one or more lights, as determined by "a three-position manual switch ... having one position wherein the light flashes periodically on and off, another position wherein the light is off, and yet another position wherein [a] tilt switch is inserted in the circuit with the light[s]." '922 Patent Abstract. Although the '922 patent was originally issued on June 26, 1979 to inventor and nonparty Alfred Dana III, LAG subsequently acquired title to this patent on or about August 11, 1993. LAG currently manufactures and sells several lines of lighted athletic shoes incorporating devices covered by the '922 patent.

Voit is a distributor of sporting goods and the owner of the federally registered trademark VOIT for use in connection with sporting goods and apparel. In 1989, Voit entered into a licensing agreement wherein ESO was granted the right to sell athletic shoes bearing Voit's registered trademark (the "1989 Agreement"). In 1991, Voit and ESO entered into a separate agreement wherein Voit granted ESO a "promotional allowance" by reducing the royalty payments owed for use of the VOIT mark on ESO's shoes (the "1991 Agreement"). Pursuant to the 1989 and 1991 Agreements, ESO has developed and marketed over 20 different styles of athletic shoes bearing the VOIT mark.

Beginning in early 1993, ESO arranged for the importation and distribution of a number of new styles of athletic shoes which incorporated flashing lights. As authorized by the 1989 and 1991 agreements, ESO then affixed Voit's mark to some of these new shoe styles (such as the allegedly infringing "Tracers," "Fireball," and "Strobe" shoes), and affixed the marks of other licensors (such as Sasson) to several other lighted shoe styles. There is no evidence that Voit encouraged ESO to initiate a line of lighted shoes, or that Voit assisted ESO in developing the designs for

these lighted shoes. To the contrary, ESO's foreign suppliers developed and manufactured the accused shoes either on their own or with assistance from ESO.

Voit's involvement with the lighted shoe line bearing its mark is best described as passive. ESO never sent samples of the lighted styles to Voit prior to ESO commencing its sales and distribution efforts, although ESO eventually did send some samples to Voit Corporation, Voit's parent company.[1] As is the case for all ESO products bearing Voit's mark, advertising and marketing plans for the accused shoes were developed and paid for by ESO and the various retail store defendants, with Voit receiving only subsequent notification of these plans. Customer complaints regarding the shoes were also referred to and serviced by employees at ESO. Apparently, Voit's direct exposure to the lighted shoe styles bearing its mark was limited to one or two corporate officers unofficially observing and examining samples which were on display in retail stores. Indeed, the only "action" taken by Voit in regards to the accused shoes occurred in February 1993, when Voit authorized an additional reduction in royalties generated by ESO's sales of lighted shoe styles in order to encourage further sales of those styles (the "1993 Agreement"). Voit evidently had no knowledge of LAG's patent prior to being served with a copy of the summons and complaint in September of 1993.

## II. DISCUSSION

"Summary judgment is as appropriate in a patent case as in any other." *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831, 835 (Fed.Cir. 1984); *accord Avia Group Int'l, Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1561 (Fed.Cir.1988). Under Federal Rule of Civil Procedure 56, summary judgment may be entered, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548,

2552, 91 L.Ed.2d 265 (1986). Summary judgment may only be granted, however, where the moving party demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Avia*, 853 F.2d at 1560.

■ To survive the motion, the nonmoving party need only present enough evidence upon which a jury might reasonably return a verdict in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *C.R. Bard, Inc. v. Advanced Cardiovascular Sys., Inc.*, 911 F.2d 670, 672–73 (Fed.Cir.1990). Although the Court will view all evidence in the light most beneficial to the nonmovant and resolve any justifiable inferences to be drawn from the facts in favor of the nonmovant, *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513; *Avia*, 853 F.2d at 1560, the nonmovant cannot rest its defense on allegations, speculation, or a mere fragment of evidence. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987); *see Anderson*, 477 U.S. at 249–50, 252, 106 S.Ct. at 2510–11, 2512; *Avia*, 853 F.2d at 1560. In other words, "a nonmovant must do more than merely raise some doubt as to the existence of a fact; evidence must be forthcoming from the nonmovant which would be sufficient to require submission to the jury of the dispute over the fact." *Avia*, 853 F.2d at 1560.

### A. Direct Infringement

■ Direct infringement occurs when someone "without authority makes, uses or sells any patented invention[ ] within the United States during the term of the patent therefor." 35 U.S.C. § 271(a). LAG is not claiming that Voit "made" or "sold" any of the allegedly infringing lighted shoes. Accordingly, the question before the Court is whether a reasonable jury could determine from the evidence that Voit "used" the accused shoes. LAG contends that Voit directly infringed the '922 patent by (i) receiving samples of the accused shoes; (ii) evaluating

---

1. Voit Corporation has not been named as a defendant in this action.

and monitoring the shoes as part of Voit's trademark quality control responsibilities; and (iii) contractually agreeing that ESO's use of the VOIT mark was to "inure to the benefit of Voit."

■ LAG's first contention suffers from both factual and legal infirmities. As a factual matter, *Voit* apparently never received any samples of the accused shoes from ESO. Instead, samples were sent to Voit's parent company, an entity that LAG has not joined as a defendant in this action. Moreover, even if the Court assumes that Voit did eventually receive samples, as a matter of law mere possession of a product or machine covered by a patent does not constitute infringement, absent a "threatened or contemplated" use or sale. *See* 4 Donald S. Chisum, *Patents* § 16.02[4] (1993) [hereinafter Chisum]; *Beidler v. Photostat Corp.*, 10 F.Supp. 628, 630 (W.D.N.Y.1935), *aff'd,* 81 F.2d 1015 (2d Cir.1936); *see also Intermedics, Inc. v. Ventritex, Inc.*, 775 F.Supp. 1269, 1286 (N.D.Cal.1991) (holding that mere "demonstration or display of an accused product, even in a [sic] obviously commercial atmosphere, does not constitute an infringing use under § 271(a)"), *aff'd,* 991 F.2d 808 (Fed. Cir.1993).

■ LAG's second contention fares no better than its first. Construing the evidence in the light most favorable to LAG, the facts demonstrate that Voit's monitoring activities involved (i) one or two corporate officers unofficially observing and handling the accused shoes in retail stores; (ii) Voit's receipt of samples of the accused shoes at or soon after the time that sales commenced; and (iii) Voit's "inspection" of the shoes at some point after sales had commenced. Without

evidence of something more, conduct of this type is insufficient to sustain a claim of direct infringement. As a matter of law, merely observing an allegedly infringing device, demonstrating that device, or observing a demonstration of that device does not constitute a "use" of that device.[2] *See, e.g., Douglas v. United States*, 181 U.S.P.Q. 170, 176, 1974 WL 20548 (Ct.Cl.Tr.Div.1974), *aff'd on other grounds,* 510 F.2d 364, 206 Ct.Cl. 96 (Ct.Cl.), *cert. denied,* 423 U.S. 825, 96 S.Ct. 40, 46 L.Ed.2d 41 (1975); *Intermedics,* 775 F.Supp. at 1286.

■ Although the common law of patents interprets the word "use" broadly, the term never has been taken "to its utmost possible scope" of meaning any activity tangentially involving the accused device. *Roche Prods., Inc. v. Bolar Pharmaceutical Co.*, 733 F.2d 858, 861 (Fed.Cir.), *cert. denied,* 469 U.S. 856, 105 S.Ct. 183, 83 L.Ed.2d 117 (1984). For example, in *Douglas v. United States*, a patentee claimed that the United States government directly infringed its patents by providing the British government with facilities to demonstrate allegedly infringing airplanes and airplane engines here in the United States. On these facts, the Court of Claims[3] failed to find infringement under Section 271(a), holding instead that the provision of facilities for a demonstration and observation of the demonstration did not constitute an infringing use. 181 U.S.P.Q. at 176; *see also Intermedics,* 775 F.Supp. at 1285–86. This reasoning makes sense. If a contrary rule were adopted, a patentee could bring a patent infringement action based on "use" against every individual who visited or happened to observe a demonstration or exhibit in a museum, store, or any other public place

---

2. Using demonstrations of a device to prove that a "sale" has occurred must be distinguished from employing demonstrations to prove a "use." As one district court recently observed:

 In *Union Asbestos & Rubber Company v. Evans Products Company*, 328 F.2d 949 (7th Cir. 1964)[,] the Court of Appeals ... noted that "... demonstrations are proper proof of 'sale' and not proper proof of 'use' because in them the accused article was not used for the purpose for which it was intended. Its intended use was to divide freight cars, not for demonstration to intended customers...." *Id.* at 951.

 While we certainly would be reluctant to resolve this matter solely on the basis of this authority, we believe that the court's reasoning is sound.... Common sense suggests that demonstration activity should be considered as evidence of an infringing "sale" and not as evidence of an infringing "use."
 *Intermedics,* 775 F.Supp. at 1286 n. 5.

3. The decisions of the Court of Claims are binding precedent for the Federal Circuit, which now has exclusive jurisdiction over appeals from district court decisions involving patent claims. *Roche,* 733 F.2d at 862.

where an allegedly infringing product or process was displayed.

In response, LAG points out that, subsequent to the Court of Claims' decision in *Douglas,* the Federal Circuit held in *Roche Prods., Inc. v. Bolar Pharmaceutical Co.* that in-house experiments involving an infringing product constitute an infringing "use" under Section 271(a). *Roche,* 733 F.2d at 863. Aside from the fact that Congress has since reversed by statute the central holding of *Roche, see Intermedics,* 775 F.Supp. at 1276, the case is factually distinguishable from the case at bar. The issue in *Roche* was whether "the limited use of a patented drug for testing and investigation strictly related to FDA drug approval requirements" is protected by the "experimental use" defense. *Roche,* 733 F.2d at 861, 863. Of utmost importance to the *Roche* court's reasoning was its belief that "unlicensed experiments conducted with a view to the adaption of the patented invention to the experimentor's [sic] business" will have a profound "economic effect on the parties even if the quantity used is small." *Id.* at 863. Here, however, any testing or inspection of samples of the accused shoes by Voit was not directed towards adapting the shoes to Voit's business. Voit's "experiments" would be directed instead towards evaluating and approving the appearance and quality of construction of the accused shoes. Such superficial examinations do not raise the same concerns as the *Roche* defendant's activities, and are, in essence, *de minimis.*

■■■■ Finally, there is LAG's liability-through-contract argument. The license agreement between Voit and ESO provides that "all uses of the [VOIT] trademark by ESO shall inure to the benefit of Voit." LAG contends that such "uses" occur only by way of a sale of the shoes by ESO, which is itself "an act of patent infringement." Although undeniably creative, this argument is pure sophistry in that it plays semantic games with the word "use." Under trademark law, marks must be used continuously in order to remain valid and enforceable. *See* 15 U.S.C. §§ 1058(a), 1127; *California Cedar Prods. Co. v. Pine Mtn. Corp.,* 724 F.2d 827, 830 (9th Cir.1984). Thus, trademark licensors

typically include a provision in their licenses stating that "all use of the mark" by the licensee inures to the benefit of the licensor, thereby seeking to prevent a loss of the licensor's rights in the mark. *See* 15 U.S.C. § 1058(a); *Coach House Restaurant, Inc. v. Coach & Six Restaurants, Inc.,* 934 F.2d 1551, 1563–64 (11th Cir.1991); *cf. Omega Nutrition U.S.A., Inc. v. Spectrum Mktg., Inc.,* 756 F.Supp. 435, 438 (N.D.Cal.1991). In this context, the term "use" generally refers to the application of a mark so as "to identify and distinguish [an entity's] goods ... from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127. In contrast, the word "use" carries an entirely different meaning for patent purposes, *see In re Mogen David Wine Corp.,* 328 F.2d 925, 930, 51 CCPA 1260 (1964) (holding that trademark rights "exist independently of [patent rights], under different law and for different reasons"), referring instead to practical applications of a device or process. *See Bauer & Cie. v. O'Donnell,* 229 U.S. 1, 10–11, 33 S.Ct. 616, 617, 57 L.Ed. 1041 (1913) ("The right to use is a comprehensive term and embraces within its meaning the right to put into *service* any given invention." (emphasis added)); *see also Intermedics,* 775 F.Supp. at 1286 n. 5.

■■■■ As an alternative formulation of its contractual argument, LAG contends that the licensing agreement creates a material question of fact as to whether an agency relationship exists between Voit and ESO. Voit can be held vicariously liable for the infringing acts of ESO if it appears that, through the licensing agreement, Voit exercised "sufficient control" over ESO. *See Drexel v. Union Prescription Ctrs., Inc.,* 582 F.2d 781, 784 (3d Cir.1978); 2 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 18.24[1] (3d ed.1994); Restatement (Second) of Agency §§ 1, 2(2), 7 (1958); *see also* Chisum §§ 16.06, 16.06[1]. Other than the 1989 Agreement, however, LAG can point to no affirmative evidence which supports its theory. Inasmuch as trademark license agreements do not in and of themselves create an agency relationship, *see Oberlin v. Marlin Am. Corp.,* 596 F.2d

1322, 1327 (7th Cir.1979); *accord Mini Maid Servs. Co. v. Maid Brigade Sys., Inc.*, 967 F.2d 1516, 1519–21 (11th Cir.1992); *Torres v. Goodyear Tire & Rubber Co.*, 867 F.2d 1234, 1236–39 (9th Cir.1989); *Drexel*, 582 F.2d at 786, and the trademark license agreement at issue indicates that Voit in fact exercised only minimal control over ESO's activities, LAG's unsupported and speculative allegations of vicarious liability are unavailing. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11; *Avia*, 853 F.2d at 1560; *T.W. Elec. Serv.*, 809 F.2d at 630.

### B. Indirect Infringement

■ Indirect infringement occurs when someone "*actively induces* infringement of a patent [by another]." 35 U.S.C. § 271(b) (emphasis added).[4] Although Section 271(b) does not specifically define the level of knowledge or intent required for liability, the Federal Circuit has clearly stated that "proof of actual intent to cause the acts which constitute the infringement is a necessary prerequisite to finding active inducement." *Hewlett–Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1469 (Fed.Cir. 1990); *accord Water Technologies Corp. v. Calco, Ltd.*, 850 F.2d 660, 668 (Fed.Cir.), *cert. denied*, 488 U.S. 968, 109 S.Ct. 498, 102 L.Ed.2d 534 (1988). In this regard, knowledge that the direct infringer was performing the acts which are later alleged to constitute infringement is not enough; there must also be a specific intent to encourage infringement of the patent. *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 553–54 (Fed.Cir.1990); *see Dynamis, Inc. v. Leepoxy Plastics, Inc.*, 831 F.Supp. 651, 656–57 (N.D.Ind.1993). Thus, in order to prevail on its inducement claim, LAG must demonstrate (i) Voit took one or more actions; (ii) for the purpose of inducing another to infringe the '922 patent; and (iii) those actions induced infringement.

■ LAG's contention that the 1991 and 1993 reductions in ESO's royalty rates induced ESO to make and sell the accused shoes is probably correct. Any reduction in ESO's production costs certainly would enable ESO to keep its prices low, thereby encouraging further shoe sales both to the retail defendants and to consumers. However, the fact that such encouragement occurred goes only to show the first and third elements of an active inducement claim. In order to satisfy the second element, intent to induce the infringement, LAG must prove that Voit knew of the '922 patent prior to taking these actions. *Manville*, 917 F.2d at 553–54 (holding that a specific intent to induce infringement cannot exist where defendants had no prior awareness of patent); *Dynamis*, 831 F.Supp. at 657 ("[I]t is clear that under § 271(b) an accused infringer must be shown to have actual knowledge of the patent and the infringement and have the actual intent to induce the infringement."); *accord Hewlett–Packard*, 909 F.2d at 1469; *Water Technologies*, 850 F.2d at 668.[5]

LAG can not demonstrate that Voit had such knowledge. The objective facts establish that Voit entered into a trademark license agreement for athletic clothing and footwear in 1989, agreed to reduce the royalty rate for all footwear sales in 1991, and agreed to further reduce the royalty rate for lighted shoe sales in February 1993. All of these events occurred prior to service of LAG's complaint in September 1993. Indeed, LAG can point to nothing in the record—other than its own conclusory allegations and a few lines of deposition testimony

---

**4.** LAG makes no claim against Voit for the other form of indirect infringement, contributory infringement. *See* 35 U.S.C. § 271(c).

**5.** The case cited by LAG for the proposition that Section 271(b) only requires "negligence" as to the existence of the infringed patent, *Keystone Retaining Wall Sys., Inc. v. Westrock, Inc.*, 22 U.S.P.Q.2d 1001 (D.Ore.1991), *rev'd on other grounds*, 997 F.2d 1444 (Fed.Cir.1993), does not so hold. *See id.* at 1002–03. In *Keystone*, the district court denied a summary judgment mo-

tion based on the existence of a material question of fact. The plaintiff therein claimed to have informed the defendants of the existence of its patent on two separate occasions, but never provided them with a copy of the patent itself. Under those circumstances, which are distinctly different from the ones present here, the *Keystone* court determined that it was a jury question whether the defendants "knew or should have known" of the plaintiff's patent. *Id.* at 1003.

taken out of context [6]—which would indicate that Voit knew of the '922 patent prior to September 1993. Thus, the direct evidence decidedly favors Voit.

■ LAG attempts to downplay this deficiency by appealing to the rule that "while proof of intent [to induce infringement] is necessary, direct evidence is not required; rather, circumstantial evidence may suffice." *Water Technologies*, 850 F.2d at 668. LAG's position here is that the existence of the 1989 Agreement and Voit's "acts taken pursuant thereto" demonstrate Voit's intent to infringe the '922 patent. Once again, LAG places far too much reliance on the Voit–ESO trademark license agreement; the mere act of licensing *by itself* does not evince an intent to induce infringement. *See Hewlett–Packard*, 909 F.2d at 1469–70; *see also Oberlin*, 596 F.2d at 1327. In *Hewlett–Packard*, the plaintiff argued that the defendant's grant of a patent license for a functionally similar device demonstrated an intent to aid the purchaser in infringing the plaintiff's patented device. The Federal Circuit rejected this contention, finding instead that

> [t]he grant of a license from B & L [the defendant] to Ametek [the direct infringer] ... is not probative of any intent to induce infringement. The license agreement between B & L and Ametek did not purport to give Ametek the right to make, use and sell X–Y plotters [the infringing device]; it merely freed Ametek from whatever bar the [B & L] patent would have been to such activity.

*Id.* at 1470. Although there was no trademark at issue in the *Hewlett–Packard* the Federal Circuit's reasoning may be applied by analogy to trademark licensing practices. By allowing ESO to use the VOIT mark to enhance footwear sales in general—or sales of lighted footwear in particular—Voit merely freed ESO from a legal bar which would otherwise prevent ESO from accessing the goodwill associated with that trademark. Without evidence of something more, the

mere fact that Voit granted ESO the right to use the VOIT mark on athletic footwear is of limited probative value on the issue of intent. *Cf. Mini Maid*, 967 F.2d at 1519–20 (holding that a trademark franchisor has no duty to "diligently prevent the independent acts of trademark infringement that may be committed by a single franchisee"); *Oberlin*, 596 F.2d at 1327 (same).

LAG contends that *Hewlett–Packard* is either inapplicable or involves an inaccurate assessment of the law. In support of its position, LAG cites *Water Technologies*, an earlier case in which the Federal Circuit found a trademark licensor liable for inducement. *Water Technologies*, 850 F.2d at 669. Although LAG's argument has some superficial appeal, *Water Technologies* is entirely consistent with *Hewlett–Packard*.

*Water Technologies* involved several patented formulas for resins used to purify water. The trademark licensor in that case developed a slight variation of the plaintiffs' patented resin formula and aided the direct infringer in producing the infringing product. In ruling that there was sufficient evidence of the licensor's intent to induce infringement, the Federal Circuit cited the following findings from the district court: (i) the trademark licensor was aware of the plaintiffs' patents; (ii) he gave the resin formulas to the direct infringer for manufacturing; (iii) he helped the direct infringer manufacture the accused resins; (iv) he prepared customer use instructions; and (v) he exercised specific control over the product through his license agreements. *Id.* at 668–69. Unlike *Hewlett–Packard*, *Water Technologies* did not involve the mere act of licensing.

The case at bar analogizes better to *Hewlett–Packard* than it does to *Water Technologies*. First, as noted previously, there is no direct evidence that Voit was aware of LAG's patent prior to being sued. Second, the available evidence demonstrates that Voit played no part in developing or marketing

---

6. As support for its position, LAG cites a portion of the deposition testimony of David Pender, Vice President and Chief Financial Officer of Voit, wherein the witness stated that he was aware that LAG owned a patent for lighted shoes. Pender Depo. at 149:23–150:18. The pertinent question did not contain a time reference, however, and Mr. Pender clarified at least two times that his knowledge of the patent-in-suit comes solely from the fact that it was attached as an exhibit to LAG's complaint. *See id.* at 24:12–27:8, 155:6–17; *see also id.* at 151:8–20.

the accused shoes, and never saw the shoes until at or about the time that sales commenced. Finally, nothing in the record indicates that Voit exercised any "control" over the accused shoes, other than "inspecting" samples sent to it around the time that sales commenced.[7] At best, Voit merely allowed its trademark to be applied to the accused shoes in exchange for royalty payments.[8]

 Notwithstanding the weakness of its claims, LAG insists that the Court cannot summarily adjudicate the issue of intent to induce infringement because "[i]ntent is a factual determination particularly within the province of the trier of fact." *Allen Organ Co. v. Kimball Int'l, Inc.,* 839 F.2d 1556, 1567 (Fed.Cir.), *cert. denied,* 488 U.S. 850, 109 S.Ct. 132, 102 L.Ed.2d 104 (1988). In order to avoid summary judgment by virtue of a

material question of fact, however, LAG must point to an evidentiary conflict created on the record; mere denials or conclusory statements are insufficient. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11; *Avia,* 853 F.2d at 1560; *T.W. Elec. Serv.,* 809 F.2d at 630. Here, the evidence is conclusive that (i) Voit had no knowledge of LAG's patent prior to performing the acts constituting "inducement"; (ii) Voit exercised no direct control over the creation and placement of advertising concerning the accused shoes; (iii) Voit had no input in how ESO used the royalty rebates; and (iv) Voit exercised no control over the development or manufacture of the accused shoes. In light of these facts, summary judgment is appropriate; there is no evidentiary basis upon which a jury might reasonably find specific intent to induce infringement as required by Section 271(b).[9]

7. Although LAG can point to nothing in the record which demonstrates that Voit exercised any control over the manufacture, distribution, or sale of the accused shoes, LAG nevertheless contends that Voit had as much authority as the defendant licensor in *Water Technologies.* A quick comparison to the license agreement at issue in *Water Technologies,* however, debunks this theory.

In *Water Technologies,* the license agreement provided that "[the licensor] grants to [the manufacturer] an exclusive license to manufacture and sell the [accused goods], *the construction of which shall have been approved by [the licensor]."* 850 F.2d at 668. In the case at bar, the analogous license agreement provision requires only (i) that the goods to which ESO attaches Voit's mark "shall substantially conform" to *ESO's* existing quality standards and (ii) that ESO "shall make available to Voit or its designees ... representative samples" of such goods. As is readily apparent, there is no advance or concurrent approval required under the Voit–ESO license agreement. Moreover, even if advance approval was required, such a requirement does not indicate an intent to infringe the '922 Patent inasmuch as this term of the Voit–ESO license agreement was negotiated over four years before the accused shoes were produced.

8. LAG also argues that an intent to infringe exists because (i) the license agreements contain a clause whereby ESO agreed to indemnify Voit in the event of a patent infringement suit, and (ii) ESO is currently paying for Voit's defense. Although some support for LAG's position may be found in the case law, LAG must do more than just point to the existence of an indemnification clause in order to survive summary judgment. As the Federal Circuit explains:

Cases have held that an indemnification agreement will generally not establish an intent to

induce infringement, but that such intent can be inferred when the primary purpose is to overcome the deterrent effect that the patent laws have on would-be infringers.

*Hewlett–Packard,* 909 F.2d at 1470 (citing Miller, "Some Views on the Law of Patent Infringement by Inducement," 53 J.Pat.Off.Soc'y 86, 150–51 (1971)); *see also* Chisum § 17.04[4][b]. The original trademark license in this case was granted almost four years before the allegedly infringing goods were created, and concerns numerous articles of sports apparel other than lighted shoes. Given these facts, the apparent purpose of this license was to effect a mutually beneficial business arrangement—ESO receiving the right to use the VOIT mark in exchange for paying a specified fee. As for the indemnification clause, nothing in the record indicates that it is anything other than what it purports to be—an agreement between Voit and ESO that ESO should bear the risk of defending against future patent infringement suits.

9. At oral argument, LAG maintained in the alternative that even if Voit did not have knowledge of the patent prior to being sued, Voit is nevertheless liable for infringing acts occurring after that point because "patent infringement is a continuing tort." *See, e.g., A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,* 960 F.2d 1020, 1031 (Fed. Cir.1992). This argument also misses the mark, however, because LAG can not demonstrate that, once Voit became aware of the patent-in-suit, Voit "acted" to induce another's infringement. As noted *supra,* the 1989, 1991 and 1993 Agreements were all negotiated and signed before Voit was notified of LAG's patent. Once these agreements went into effect, Voit's involvement with the accused shoes was limited to receiving its royalty payments. Furthermore, even if the Court assumes *arguendo* that Voit had the right

Finally, with regard to LAG's contention that Voit induced consumers to purchase and use the accused shoes through its advertising, the evidence clearly establishes that Voit itself never advertised the accused shoes. Witnesses for both Voit and ESO testified that ESO and the retail defendants developed and financed the advertising campaigns for all ESO shoe designs bearing the VOIT mark, whether or not those designs incorporated flashing-light devices. Furthermore, even if the Court construes the royalty reductions in the 1991 and 1993 Agreements as passively funding these advertising activities, such conduct was not intended to induce infringing conduct because all royalty reductions were negotiated and implemented prior to Voit becoming aware of the '922 patent.

Indeed, the case at bar bears a startling resemblance to a case recently decided in the District of Minnesota, *Maxwell v. K mart Corp.*, 851 F.Supp. 1343, 30 U.S.P.Q.2d 1593 (D.Minn.1994). The direct infringer in that case had an exclusive license from K mart Corporation ("K mart") to operate the shoe departments in all K mart stores, as well as a sub-license from K mart to sell shoes bearing the JACLYN SMITH trademark. *Id.* 851 F.Supp. at 1345–47, 30 U.S.P.Q.2d at 1594–95. Without any prior knowledge on K mart's part, the direct infringer started binding together pairs of shoes with a device that allegedly read on the plaintiff's patent. Not unlike LAG, the plaintiff then argued that K mart had induced this infringement by

> (1) licensing its shoe departments to [the direct infringer]; (2) profiting from [the direct infringer]'s operation of the shoe departments; (3) owning a large amount of stock in [the direct infringer's subsidiary], the company which operates the shoe departments; (4) receiving dividends from [the subsidiary]; and (5) permitting [the direct infringer] to sell shoes under its Jaclyn Smith trademark.

*Id.* 851 F.Supp. at 1349, 30 U.S.P.Q.2d at 1596. On a motion for summary judgment, the district court ruled as follows:

> As a licensor, K mart has the ability to monitor the general nature and quality of the goods sold under its Jaclyn Smith trademark. Aside from pure speculation, [the plaintiff] has failed to show any relation between the license of K mart's Jaclyn Smith trademark and the alleged infringement by [the direct infringer]....
>
> ... The patent laws prohibit K mart from infringing or actively inducing the infringement of another. The patent laws do not impose an affirmative duty on K mart to stop the infringement of another. Maxwell has produced no evidence which tends to show that K mart intended to induce [the direct infringer]'s alleged infringement of the [plaintiff's] patent.

*Id.* 851 F.Supp. at 1349, 30 U.S.P.Q.2d at 1596–97. As is readily apparent from this brief description of the *Maxwell* case, K mart had far more "circumstantial" ties to its licensee's allegedly infringing activities than Voit does here. Thus, despite LAG's assertions to the contrary, this Court is not alone in concluding that the existence of a trademark licensing agreement and the conduct of limited quality monitoring activities pursuant thereto is not sufficient in and of itself to establish a licensor's intent to induce infringement by its licensee.

## III. CONCLUSION

Inasmuch as no dispute exists as to any material fact in this case, Voit's motion for summary judgment is granted. The evidence before the Court demonstrates that Voit neither used the patent-in-suit within the meaning of Section 271(a), nor induced another to infringe the patent-in-suit within the meaning of Section 271(b).

IT IS SO ORDERED.

---

to terminate this passive "activity" by unilaterally cancelling its agreements with ESO, Voit's failure to do so is at best an omission, not an action.