BLACK & DECKER (US) INC., Black & Decker Inc., Plaintiffs,

v.

CATALINA LIGHTING, INC., Westinghouse Electric Corp., Defendants.

No. 1:96CV1577.

United States District Court, E.D. Virginia, Alexandria Division.

Feb. 28, 1997.

Amy S. Owen, Miles & Stockbridge, Mc-Lean, VA, Raymond P. Niro, John C. Janka, Raymond P. Niro, Jr., Christopher J. Lee, David J. Sheikh, Niro, Scavone, Haller and Niro, Chicago, IL, for Plaintiffs.

Terence P. Ross, Gibson, Dunn & Crutcher, L.L.P., Washington, DC, V. Bryan Medlock, Jr., William O. Fifield, Charles S. Cotropia, Sidley & Austin, Dallas, TX, David T. Pritikin, Thomas D. Rein, Sidley & Austin, Chicago, IL, for Catalina.

Jonathan D. Schiller, Jason Shrinsky, Kaye, Scholer, Fierman, Hays & Handler, L.L.P., Washington, DC, for Westinghouse.

## MEMORANDUM OPINION

ELLIS, District Judge.

In this patent infringement action, Black & Decker,[1] the owner of United States Patent No. 5,567,115 (the "115 patent"), sues Catalina Lighting, Inc. ("Catalina") for direct infringement under 35 U.S.C. § 271(a) and Westinghouse Electric Corp. ("Westinghouse") for inducing Catalina's infringement under 35 U.S.C. § 271(b).[2] More specifically, the subject matter of the 115 patent is a flexible flashlight and Black & Decker claims Catalina made, used and sold an infringing product. Further, Black & Decker claims that Westinghouse induced this infringement by licensing Catalina to use the Westinghouse trademark in the promotion and sale of various products, including the accused products, and by undertaking various activities pursuant to the license.

Now that the parties have completed substantial discovery, Westinghouse seeks summary judgment, contending that, as a matter of law, neither the trademark license nor any Westinghouse activities undertaken pursuant to the license constitute inducement of infringement. Black & Decker opposes summary judgment, claiming that on the current record there is a triable issue of fact on the inducement claim.

### I.

Black & Decker's 115 patent issued on October 22, 1996. The patent's subject matter is a type of flexible flashlight. An embodiment of the invention disclosed in the patent is Black & Decker's "Snakelight", which is advertised and sold nationally.

---

1. The plaintiffs, Black & Decker (U.S.) Inc., and Black & Decker, Inc., are collectively referred to as "Black & Decker".

2. Initially, Black & Decker also asserted a § 271(a) claim against Westinghouse, contending that Westinghouse's handling of the accused products pursuant to the trademark agreement constituted an infringing "use." Black & Decker has now abandoned that claim, leaving only the § 271(b) claim against Westinghouse.

Catalina manufactures and sells various lighting products, Decker to infringe the 115 patent.[3] In December 1995, Catalina contacted Westinghouse to inquire about obtaining authorization to use the Westinghouse trademark on Catalina lighting products. Negotiations ensued,[4] culminating ultimately in the execution of a trademark licensing agreement ("the Agreement") on April 26, 1996, some six months before the issuance of the 115 patent. The principal terms of the Agreement are easily summarized. First, the Agreement authorizes Catalina, for an initial term of 66 months,[5] to use the Westinghouse trademark only in connection with the use and sale of certain Catalina light fixtures, portable lights and flashlights as specified in an exhibit to the Agreement. Thus, the Agreement licenses Catalina to use the Westinghouse trademark on a variety of lighting products other than the accused products; it is not specifically directed to any particular Catalina flashlight product. Next, the manner of calculating royalties due under the Agreement varies somewhat over the first four years, but is, in essence, either a fixed minimum payment (applicable only in the first two years) or a varying percentage of product shipments (applicable in all years).[6] Only one royalty payment has been made to date under the Agreement. This $16,478 payment occurred on November 13, 1996, and represented the royalties for sales in the quarter ending September 30, 1996 of all products sold under the Agreement, not limited to accused products.

As is typical of trademark licensing arrangements, the Agreement refers to product quality standards and inspection rights. This reflects the legitimate interest a trademark licensor has in the quality and appearance of the products which bear the licensed mark. Specifically, the Agreement gives Westinghouse the right on reasonable notice to inspect Catalina's manufacturing facilities directly related to the covered products. It also provides that the products licensed to bear the Westinghouse trademark "shall all be of a single, appearance and quality satisfactory to Westinghouse". To this end, the Agreement provides that product samples are to be provided to Westinghouse for inspection and testing and that once a product is approved by Westinghouse for trademark use, the product may not be materially changed thereafter without Westinghouse's prior written consent. In accordance with these provisions of the Agreement, it appears that Catalina product and packaging samples were sent to Westinghouse and that Westing-

3. The accused Catalina products are those sold under the names "PORTABLE HUGGER," "PORTABLE COMPACT HUGGER," "PIVOT HUGGER LIGHT," "PIVOT–HEAD PORTABLE WORKLITE" and "PORTABLE SLIMLINE WORKLITE" and/or bearing the product codes G920, G332, G332A, G333 and G33A.

4. Prior to commencing negotiations, Westinghouse undertook a preliminary evaluation of Catalina, including review of Catalina's Form 10K and its annual report. While there may be some dispute concerning precisely what pre-negotiation investigation was undertaken by Westinghouse, those disputes are not material to the disposition of the summary judgment motion.

Similarly, any disputes concerning precisely what investigatory steps Westinghouse undertook during the course of negotiations are also not material. It is undisputed that during negotiations, a Westinghouse representative traveled to Florida to visit the Catalina manufacturing facility and confirmed, *inter alia* that Catalina's products conformed to United Laboratory (UL) standards.

5. According to § 9 of the Agreement each party has the right to terminate the agreement for failure to meet minimum net shipping requirements during years 3,4, and 5 of the Agreement. Also, the Agreement grants Catalina the option to extend the term for two additional five year periods by giving written notice 90 days prior to the end of a term.

6. Exhibit D to the Agreement provides as follows:

*Royalties*

Year 1: 2% of all Net Shipments of Westinghouse Brand products with minimum payment of $250,000. Payments commencing when Net Shipments begin, but the first year minimums are calculated during the first 18 months of the contract;

Year 2: 2% of all Westinghouse Brand Net Shipments with minimum royalty payment of $500,000;

Year 3: 3% of all Westinghouse Brand Net Shipments with minimum total Net Shipment of Westinghouse Brand products of $25 million;

Year 4: 4% with minimum Net Shipments of Westinghouse Brand products of $40 million;

Year 5 and thereafter: 4% with minimum Net Shipments of Westinghouse Brand products of $60 million.

house approved all of them. Although the record does not specifically disclose whether the various accused products were included in the samples sent to Westinghouse, Black & Decker, in these circumstances, is entitled to an inference that this occurred.[7] Nothing in the record, however, suggests or warrants an inference that Westinghouse ever suggested or requested any changes in the design or manufacture of any of the accused products or that Westinghouse exercised control over the design, development or manufacture of any Catalina products.

In addition to providing for Westinghouse's inspection and testing of covered products and packaging, the Agreement also contemplates that Westinghouse may review and approve advertising and promotional materials to be used in connection with covered products. In this regard, the record reflects that Westinghouse has reviewed and approved various advertising and promotional materials, including a press release announcing Catalina's plan to market certain of its products under the Westinghouse trademark. Also reflected in the record is that Catalina prominently displayed Westinghouse's name and trademark in various promotional materials and catalogs concerning the covered Catalina products. But nothing in the record suggests or warrants the inference that Westinghouse financed any of Catalina's promotional efforts or controlled or directed the placement of advertising.

Included in the Agreement are various representations and warranties made by each of the parties, as well as corresponding indemnifying provisions relating to breaches of any representations and warranties. Particularly pertinent here were Catalina's representation and warranty that Catalina's manufacturing, sales and distribution of the covered products is in full compliance with all laws and that no claims, suits or other procedures were pending or threatened that would adversely affect Catalina's ability to perform its obligations under the Agreement. Corresponding to this representation is an indemnification provision providing that Catalina would fully indemnify Westinghouse for any breach of the representation.

The Agreement had been in effect for approximately six months before the 115 patent issued in late October 1996. The complaint in this action was filed on Friday, November 1, 1996 and served on Westinghouse on Monday, November 4, 1996. It appears from the record that prior to service of the complaint, Westinghouse had no knowledge of the 115 patent, nor of any alleged infringement of the 115 patent by any Catalina products.

Simultaneous with the service of the instant complaint on November 4, Black & Decker sought a preliminary injunction against both Catalina and Westinghouse. Catalina responded in writing to this request on November 6, 1996, contending (i) that its products did not infringe the 115 patent, and (ii) that the 115 patent was invalid. Thus, within two days of learning of Black & Decker's 115 patent, Westinghouse had been assured through the papers filed by Catalina in opposition to the preliminary injunction that Catalina's products did not infringe a valid patent. On November 12, 1996, this Court, although finding that Black & Decker had demonstrated likelihood of success on the merits, nonetheless denied a preliminary injunction on the basis of the small number of alleged infringing products that Catalina represented it would sell during the pendency of the suit. This number was so low as to rebut any presumption of irreparable harm to Black & Decker in denying the injunction. Following disposition of the preliminary injunction motion, the uncontradicted record reflects that Westinghouse received notice from Catalina that shipments of the accused products bearing the Westinghouse trademark had ceased. Black & Decker contends that notwithstanding this notice, accused products bearing the Westinghouse trademark continued to be manufactured and sold.

## II.

The principles governing summary judgment are well settled. Summary judgment is

---

7. *See, e.g., Cole v. Cole,* 633 F.2d 1083, 1090 (4th Cir.1980)(citing 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2727)("Because the burden is on the movant, the evidence ... is construed in favor of the party opposing the motion and he is given the benefit of all favorable inferences that can be drawn from it.")

appropriate where the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. This standard is met where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A "mere scintilla" of evidence is not enough. To the contrary, when viewed in the light most favorable to the non-moving party, the evidence must be sufficient for a reasonable trier of fact to find in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). These principles, applied here, command summary judgment if the record, when viewed in the light most favorable to Black & Decker, would still not allow a reasonable trier of fact to conclude that Black & Decker has proven by a preponderance of the evidence that Westinghouse actively induced Catalina's direct infringement.

### III.

■■■ Given that Black & Decker has withdrawn its claim of direct infringement against Westinghouse, the only remaining claim against Westinghouse is for inducement of Catalina's infringement. Section 271(b) of the patent statute provides that "[w]hoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). Under this provision, "a person infringes by actively and *knowingly*

aiding and abetting another's direct infringement." *Water Technologies Corp. v. Calco, Ltd.*, 850 F.2d 660, 668 (Fed.Cir.1988), *cert. denied, Calco, Ltd. v. Water Technologies Corp.*, 488 U.S. 968, 109 S.Ct. 498, 102 L.Ed.2d 534 (1988) (emphasis in original). Thus, to establish a claim for inducement the following elements must be proved:

(1) an inducer's knowledge of the asserted patent, *see Hewlett–Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1469 (Fed.Cir.1990);

(2) the presence of direct infringement by the third party allegedly induced, *see Water Technologies*, 850 F.2d at 668 ("[A] person infringes [by inducement] by … aiding and abetting another's direct infringement.");

(3) an inducer's actual intent to cause the acts which "he knew or should have known would induce actual infringements",[8] *Manville Sales Corp. v. Paramount Systems, Inc.*, 917 F.2d 544, 553 (Fed.Cir.1990); *see also R2 Medical Systems, Inc. v. Katecho, Inc.*, 931 F.Supp. 1397, 1441 (N.D.Ill.1996); *L.A. Gear, Inc. v. E.S. Originals, Inc.*, 859 F.Supp. 1294, 1300 (C.D.Cal.1994); and

(4) the commission of an act that constitutes inducement, not merely the power to act or the failure to act. *See Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1569 (Fed.Cir.1994), *cert. dismissed, Royal Sovereign Corp. v. Beverly Hills Fan Co.*, 512 U.S. 1273, 115 S.Ct. 18, 129 L.Ed.2d 917 (1994) ("[A]ctive inducement of infringement requires the *commission* of an affirmative act.") (emphasis in original).[9]

---

**8.** The intent required is more than merely the intent to cause the acts which constitute infringement. While an inducer need not have the subjective knowledge that encouraging infringement is, itself, infringement, an inducer must know that the acts it aided and abetted constitute infringement. *See Manville*, 917 F.2d at 553; *see also* 3 Peter Rosenberg, *Patent Law Fundamentals* § 17.02[2][a] (2d ed.1996).

**9.** This does not preclude, in an appropriate case, the possibility that the failure to act where there is a duty to act might amount to inducement. Consider, for example, a case in which an infringing manufacturer consigns an infringing product to a retailer before the issue date of a

patent and thereafter, subsequent to the issue date, the patentee sues the manufacturer for infringement. Assume further that consignee retailer, unaware of the patent or the suit, informs the manufacturer that it is concerned about possible infringement, and asks whether infringement claims have been made or threatened. The retailer further states that unless it hears to the contrary from the manufacturer, it will continue to promote and sell the accused product. In these circumstances, the manufacturer's silence may constitute inducement. Nor is this result foreclosed by *Beverly Hills Fan*, which required commission of an affirmative act to constitute inducement for the purposes of the Virginia long-arm statute and not for the purpose of defining

Of course, there can be no actionable inducement of infringement until there is actionable infringement. This follows from the fact that inducement requires (i) the existence of direct infringement, and (ii) the inducer's knowledge of the direct infringement.

■ Here, actionable infringement did not begin until November 4, 1996. This follows from the fact that Westinghouse had no notice of the patent in suit until the November 4, 1996 service of the instant complaint. Accordingly, the proper focus of the inducement inquiry is the conduct and acts of Westinghouse (i) occurring after November 4, 1996, and (ii) alleged to constitute inducement. Yet, Black & Decker contends that Westinghouse can be liable for acts of inducement occurring before November 4, 1996 that result in direct infringement after that date. This contention is unpersuasive, and contrary to Federal Circuit authority. *See National Presto Industries, Inc. v. West Bend Company,* 76 F.3d 1185, 1196 (Fed.Cir.1996) ("The principle of liability for 'aiding and abetting' ... is *not imposed retrospectively, to make illegal an act that was not illegal when done.").* This does not mean that pre-notice actions are never relevant to inducement. Such actions may be relevant in certain circumstances where, for instance, they create a post-notice duty to act.[10] No such circumstances are presented by the record evidence in this case. Accordingly, the question presented is whether a reasonable trier of fact could find that Westinghouse committed any acts after November 4, 1996, that it knew or should have known would induce actual infringement by retailers or customers.

## IV.

■ These principles, applied here, point persuasively to summary judgment for Westinghouse. The uncontradicted record reflects that after learning of the 115 patent, Westinghouse exercised no control over the manufacture, advertising or form of the accused products. And, the uncontradicted record further reflects that following the preliminary injunction hearing, Catalina advised Westinghouse that Catalina would ship no more flashlights bearing the Westinghouse trademark. Black & Decker contends that accused products bearing the Westinghouse trademark were in fact sold after the date on which Westinghouse learned of the instant complaint and the patent in suit. This, by itself, does not establish inducement by Westinghouse. The record is clear that Westinghouse was assured that accused products bearing its mark would not be shipped, a representation sufficient to preclude a reasonable trier of fact from finding that Westinghouse actively encouraged Catalina to make, use or sell the accused product. Thus, summary judgment is appropriate for Westinghouse on its liability for active inducement.

In an effort to escape this result, Black & Decker argues that Westinghouse can be liable for inducement even absent affirmative acts after November 4, 1996. Specifically, Black & Decker contends that Westinghouse can be liable for active inducement because (i) Westinghouse had the power under the Agreement to review and approve Catalina's infringing products, and (ii) Westinghouse failed to stop the alleged infringing acts by Catalina upon learning of the instant suit. These contentions are addressed separately.

## A.

■ The Agreement conferred on Westinghouse the power to review products carrying its trademark for overall quality and the presentation of its mark. This is sensible given that a licensor has a duty to take,

> effective steps to ensure that the product sold by the licensee is of the same quality as the product sold by the licensor under the same name, so that consumers are not deceived by the identify of names into

the scope of inducement liability. 21 F.3d at 1569. In any event, this record contains no evidence to suggest that an omission to act by Westinghouse could amount to inducement under 35 U.S.C. § 271(b).

10. Thus, providing products to retailers on consignment before the date of notice might be relevant if such actions (i) give rise to a duty to recover these products after the notice date, and (ii) the failure to recover the products aids or abets a retailers' direct infringement. See *supra* note 9.

buying a product different from what they reasonably expected. *AmCan Enterprises, Inc. v. Renzi*, 32 F.3d 233, 235 (7th Cir.1994). Indeed, failure to maintain quality control may render a licenced trademark abandoned, or estop a licensor from complaining about infringement. *Id.* On the other hand, certain types of control by a licensor could constitute active inducement. For example, if Westinghouse had reviewed the accused product and specified the manner in which Catalina might modify the product to avoid infringement, then Westinghouse might well be liable for inducement should the resulting product nonetheless infringe. But nothing of this sort actually occurred. Hence Black & Decker's argument rests solely on the contention that this *could have happened,* given the scope of the powers the Agreement confers on Westinghouse. The short answer to this argument, even assuming *arguendo* that Black & Decker correctly construes the Agreement, is that inducement turns not on the potential to aid and abet infringement, but rather on the aiding and abetting that actually occurs. The fact that Westinghouse may have some contractual powers with respect to Catalina's manufacture of the accused products is irrelevant. An entity aids and abets infringement, i.e., induces infringement, not by virtue of what can be done, but by virtue of what is done. *See, e.g., Manville*, 917 F.2d at 553 ("Plaintiff has burden of showing that the alleged infringer's **actions** induced infringing acts . . . .") (emphasis added). And since the record reflects that after November 4, 1996 no powers under the Agreement to review or approve the accused products were exercised in any way, let alone in a way amounting to inducement, it follows that these contractual powers provide no basis for infringement liability.

### B.

Black & Decker further contends that Westinghouse induced infringement after November 4, 1996 by (i) failing to stop the manufacture and sale of accused products, and (ii) failing to terminate the Agreement.

Black & Decker asserts that Westinghouse, having acted before November 4, 1994 to aid and abet Catalina's infringement after that date, faces inducement liability for failing to stop the sale and manufacture of accused products after learning of the alleged infringement. *See, e.g., Black & Decker (U.S.), Inc. v. Home Product Marketing, Inc.*, 929 F.Supp. 1114, 1121 (N.D.Ill.1996). In the circumstances of this case, Westinghouse had no duty to stop the manufacture, shipment, use or sale of the accused product upon learning of the alleged infringement. An argument for inducement liability for failing to stop infringing acts occurring before the issuance of a patent has some force in the case of a direct infringer's inducement of customers. Thus, in *Home Product*, a manufacturer of flashlights copied the design of the patent in suit before the patent's issue date and therefore knew that upon issuance of the patent its products would directly infringe. 929 F.Supp. at 1121. Nevertheless, the manufacturer provided these flashlights to retail stores for their unrestricted use, knowing that upon the patent's issuance the use of these products by the retailers would infringe. Id. The court in that case found that the manufacturer's knowledge (i) that the flashlights would infringe, and (ii) that the retailers would use the infringing flashlights after the issue date of the patent, obligated the manufacturer to retrieve the products or face liability for inducement. *Id; see also supra*, note 9.

This theory has less force where, as here, the inducer is the licensor of a trademark. Westinghouse had no reason to know before November 4, 1996 that the manufacture and sale of the accused products might directly infringe the 115 patent.[11] Thus, actions of Westinghouse taken before November 4, 1996 could not have been undertaken with the specific intent to cause infringement after November 4. Accordingly, there is no basis in this record that would allow a trier of fact to hold Westinghouse liable for failing to take steps after November 4, 1996 to stop the use

---

11. To the contrary, Catalina warranted to Westinghouse in the Agreement that Catalina's manu-

facturing and selling activities were lawful.

and sale of the accused products bearing the Westinghouse mark.

■ Black and Decker contends, in the alternative, that Westinghouse is liable for active inducement for failing to terminate the Agreement after November 4, 1996. In Black & Decker's view, the failure to terminate the Agreement created the risk that the reputation and familiarity of the Westinghouse trademark would encourage sales of the accused product. This argument is unpersuasive. A trademark licensor faced with an allegation of infringement with respect to a product bearing its mark is presented with a choice between honoring its licensing agreement or possible liability for infringement. In these circumstances, the proper balance between these competing concerns requires a trademark owner to terminate a licensing agreement only where no basis exists for a good faith, reasonable belief that there is no infringement of a valid patent. Only if no such basis exists, must a trademark owner prohibit further use of its mark on the accused product. This test strikes the proper balance between a trademark owner's contractual licensing obligations and its duty to refrain from aiding and abetting the infringement of a patent.

Black & Decker contends that even adopting such a standard, Westinghouse can be liable for inducement because it had no basis for a good faith, reasonable belief that Catalina's products did not infringe. This is so, by Black & Decker's lights, because the Court found that Black & Decker had shown a likelihood of success on the merits at the preliminary injunction stage. This, too, is unpersuasive. First, the determination of likelihood of success on the merits was dicta, given that the preliminary injunction was denied on the basis of the balance of the hardships. And, as the denial of Black & Decker's motion for summary judgment of infringement demonstrates, the evaluation of the merits of a claim at the preliminary injunction stage is not always a reliable indicator of the ultimate disposition of those claims. The facts here are that Westinghouse was presented with Black & Decker's accusation of infringement and Catalina's denial of infringement and defense of invalidity.

Under the terms of the Agreement, Westinghouse was entitled to rely on Catalina's representation, backed up by the Agreement's indemnity provision, that Catalina's accused products fully complied with the patent laws. Moreover, Westinghouse claims that its own review of Catalina's position on the issues of infringement and the validity of the 115 patent served to confirm that Catalina was not infringing a valid patent. These facts provided a sound basis for Westinghouse's good faith, reasonable belief that Catalina's products did not infringe, thereby precluding any reasonable trier of fact from finding that Westinghouse induced infringement by failing to terminate the Agreement.

Given the instant facts, Westinghouse, as a trademark licensor, was not under a duty (i) to stop Catalina's alleged infringement, or (ii) to terminate the Agreement. Thus, the failure to do these acts is not the basis for inducement liability. In sum, Westinghouse committed no act, and failed in no duty after November 4, 1996 that provides the basis upon which a reasonable trier of fact could find by a preponderance of the evidence that Westinghouse actively aided or abetted Catalina's alleged infringement of the 115 patent.

Accordingly, Westinghouse's motion for summary judgment must be granted. An appropriate Order has already issued.

The Clerk is directed to send copies of this Memorandum Opinion to all counsel of record.